**UNITED STATES of America,**

v.

**John PETERS, Defendant Petitioner.**

**No. 1:07–CR–261.**

United States District Court, N.D. New York.

April 12, 2013.

---

Kindlon Shanks & Associates, Of Counsel: Terence L. Kindlon, Esq., Glen S. Hammond, Esq., Albany, NY, for Defendant–Petitioner.

Richard S. Hartunian, United States Attorney for the Northern District of New York, Of Counsel: Robert A. Sharpe, Esq., Ass't United States Attorney, Albany, NY, for United States.

### MEMORANDUM–DECISION and ORDER

DAVID N. HURD, District Judge.

## I. *INTRODUCTION*

Defendant petitioner John Peters ("Peters" or "petitioner") was released from prison on May 12, 2009. Pursuant to 29 U.S.C. § 504(a), petitioner is prohibited from serving in certain enumerated authority positions within a labor organization for a period of thirteen years after the end of his imprisonment, or until May 13, 2022. However, he may petition to reduce that time period, but not less than three years following the end of his imprisonment. He has now been under the prohibition for almost four years.

Peters now petitions for a reduction in the thirteen year period. The United States of America (the "Government") opposes. On March 14, 2013, a hearing was held pursuant to § 504(a). Decision was reserved.

## II. *BACKGROUND*

In May 2003, Peters was a labor organizer with Laborers' International Union of North America ("LIUNA") and Local Laborers Union 190 ("Local 190") in Glenmont, New York. At that time, Local 190 was picketing a Wal–Mart construction site in Glenmont. A non-union general contractor was responsible for the project, and Local 190 wanted no one crossing their picket lines at the site. Tri–Cities Aggregate ("Tri–Cities"), a cement manufacturer, was selected by the general contractor to be the concrete supplier for the Wal–Mart site.

On or around May 7, 2003, Peters and several fellow union members were drinking at a local bar. They discussed plans to do something to "shut down" Tri–Cities as a means of slowing the construction at the Wal–Mart site. Peters commented that the trailer at Tri–Cities contained the computer that kept track of the cement shipments and that, if the trailer was damaged or destroyed, the cement operations at the Wal–Mart site would be disrupted. During the conversation, Peters took a beer bottle and showed the others how it could be made into a Molotov cocktail.

On May 8, 2003, Peters and one of the union members from the night before were again at a bar and discussed doing "something about that concrete plant." At that point, the two men called a third union member to meet them at the bar. The three men took a bar rag and rubber gloves from the bar, picked up a twelve-pack of Coors Light beer bottles, and drove to a friend's house where they knew they could find gasoline. They then drove to the Tri–Cities plant where Peters put on rubber gloves and demonstrated how to

make Molotov cocktails. The target was the Tri–Cities trailer. Peters and one of the union members dropped the third man off near the targeted trailer. That individual then threw two devices, one of which set the trailer on fire. Peters and the other union member picked up the third man and they went to Denny's Restaurant where Peters made it a point to use his union credit card to show that the three men were somewhere else at the time of the firebombing.

Neither Peters nor his fellow union members were charged immediately following the incident. From 2004 to 2005, Peters served as Deputy Trustee for the Veterans Hospital in Delaware, where he worked to uncover and dismantle internal corruption. He also worked as Deputy Trustee for Locals 1010 and 1018, helping to remove corrupt leaders from positions of authority in the unions. Lastly, Peters helped the National Labor Relations Board and the Department of Justice prevent organized crime from infiltrating local unions in New York City.

Subsequently, on December 11, 2006, Peters was charged with a single count of arson in violation of 18 U.S.C. § 844(i). He pleaded guilty on June 15, 2007. As a result of his conviction, he was forced to step down from his position as Deputy Trustee. He began work as a laborer, but on September 26, 2007, he sustained a work-related injury after falling more than twenty feet when a wooden beam that he was standing on broke. He injured his shoulder, back, and neck.

On May 7, 2008, Peters was sentenced by the undersigned to serve twelve months and one day in prison, followed by three years of supervised release. Again, he was released from prison on May 12, 2009. He was released from supervised release on April 21, 2011.

After his release from prison, he underwent three surgeries relating to the injuries he suffered in his previous fall. These surgeries prevented him from performing physical labor. He applied for and received social security disability benefits during this time. Because his injuries preclude him from performing physical labor, he now seeks a managerial position in a labor union.

## III. DISCUSSION

### A. Standard

Section 504(a) of the Labor–Management Reporting and Disclosure Act of 1959 ("LMRDA") prohibits persons convicted of certain crimes from holding positions of authority in labor unions for at least thirteen years after conviction of the crime or the end of the term of imprisonment, whichever is later. The purpose of § 504 is to "secure high standards of responsibility and ethical conduct in labor organizations by locking out ... those people who demonstrate an inability to abide by such standards." *United States v. Cullison*, 422 F.Supp.2d 65, 68 (D.D.C.2006); *see also* 29 U.S.C. § 401(a).

However, the employment restriction is not absolute. There are "rare occasions where a [thirteen] year ban might be considered too harsh." *United States v. Martin*, No. 02–127(1), 2009 WL 928631, at *4 (D.Minn. Apr. 1, 2009). In such cases, a defendant may seek one of three types of relief: (1) petition the sentencing court to reduce the duration of the disability, (2) obtain full restoration of citizenship rights, or (3) petition the sentencing court for an exemption based on the court's determination that petitioner's service in a prohibited capacity does not violate the purpose of the LMRDA. *Cullison*, 422 F.Supp.2d at 69. The only difference between a reduction and an exemption is that an exemption does not require the passage of initial three-year period, while a reduction does.

As noted, Peters seeks a reduction of the thirteen year period. The statute is silent on what the petitioner must demonstrate for a reduction and there is no controlling precedent regarding the burden on either party. It is logical that "the standard of review for granting a reduction . . . should be at least as high as that for granting an exemption because granting a reduction in a case such as this has the same effect as granting a mass exemption for all five areas of disqualified employment under § 504(a)." *Cullison*, 422 F.Supp.2d at 71. An exemption may be granted if the sentencing judge, pursuant to the Sentencing Guidelines and the policy statements expressed in 28 U.S.C. § 994(a), determines that such person's service in a capacity otherwise prohibited by § 504(a) would not be contrary to the purposes of the statute. 29 U.S.C. § 504(a). Pursuant to the Sentencing Guideline's policy regarding exemptions from § 504(a),

> relief shall not be given to aid rehabilitation, but may be granted only following a clear demonstration by the convicted person that he or she has been rehabilitated since commission of the disqualifying crime and can therefore be trusted not to endanger the organization in the position for which he or she seeks relief from disability.

U.S. Sentencing Guidelines Manual § 5J1.1 (2013). Therefore, the petitioner bears the burden of " 'clearly showing that he is rehabilitated.' " *Henry v. Chao*, No. 06–CV–309, 2007 WL 1040856, at *3 (W.D.Tex. Apr. 4, 2007) (quoting *Local Union 705 v. U.S. Dep't of Labor*, No. 03 C 5480, 2003 WL 22836375, at *2 (N.D.Ill. Nov. 24, 2003)). Accordingly, courts must analyze whether the petitioner has been fully rehabilitated, and whether it would be contrary to the purposes of the LMRDA, considering the nature and gravity of the petitioner's crime(s), for the petitioner to hold such a position. *See Cullison*, 422 F.Supp.2d at 72, 74–75.

### B. *Petitioner's Rehabilitation*

At the hearing, petitioner presented the following witnesses and exhibits: J. Bruce Mouw ("Mouw"), now of the LIUNA Office of the Inspector General; Vincent Masino ("Masino"), LIUNA Vice President and Assistant Regional Manager; and Annmarrie Peters ("Annmarrie"), petitioner's wife, testified in support of his petition. Peters also testified on his own behalf. Finally, multiple letters of support were submitted with the petition.

The Government submitted a memorandum in opposition. Department of Labor ("DOL") Investigator Robert Rennard who conducted an investigation on behalf of the DOL which supported the opposition was present at the hearing.

Mouw and Masino testified that they each worked with Peters prior to his incarceration. Mouw spent much of his career working to fight organized crime, first with the FBI and later with the Inspector General's Office. He met Peters in May 2005 when Peters was helping him investigate corruption in unions. He testified that Peters was trustworthy and an asset to him. Most of Mouw's interactions with Peters were prior to his conviction and incarceration. Mouw's last dealings with Peters were in summer 2007 but he spoke with Peters once during his supervised release period.

Masino testified that he met Peters in the mid-to-late nineties. Later, in 2005, they worked together as Trustee (Masino) and Deputy Trustee (Peters) for the Veteran's Hospital in Delaware and Locals 1010 and 1018. He too had most of his dealings with Peters prior to petitioner's incarceration, but the two spoke on the phone a few times during petitioner's supervised release period. Masino, like

Mouw, testified that Peters was very hard-working when he served as Deputy Trustee. Masino testified that it would be in the union's best interest to have Peters back.

Annmarrie testified that her husband has been rehabilitated since the incident ten years ago. His family is now a priority over the labor union. She testified that he has changed his drinking habits since the crime; he used to drink frequently, but now, only rarely. The two have attended marital and family counseling. According to Annmarrie, Peters also helped their daughter Danielle through her own battle with addiction.

Letters of support were submitted from Danielle Peters, petitioner's daughter; Armand E. Sabitoni, General Secretary–Treasurer and New England Regional Manager for LIUNA; and Keith J. Loscalzo, Business Manager for Local 1010. Danielle Peters detailed the impact that her father's incarceration had on her life and also the toll that being out of work has taken on her father. She contends that everyone, including the union, would benefit if her father were able to contribute his passion, intelligence, and talent to union causes.

Mr. Sabitoni expressed his support for a reduction, and asserts that he and petitioner worked closely for more than ten years. In that time, he found petitioner to be dedicated, hard-working, and committed to improving the lives of LIUNA members and their families. His letter contends that petitioner's proven dedication to LIUNA's mission, coupled with his energy, experience, work ethic, and effectiveness will ensure his re-employment with either LIUNA or one of its affiliates.

Finally, Mr. Loscalzo wrote that he and petitioner worked closely together in the late nineties when petitioner was instrumental in developing a class to assist the public with an understanding of the benefits unions have in society. He also worked with petitioner in 2005 as Deputy Trustee of Locals 1010 and 1018. He attested to petitioner's professionalism as a labor leader when petitioner utilized the National Labor Relations Board, the federal courts, and the Department of Labor to restore the local's integrity after fending off a raid by previous leaders. Mr. Loscalzo contends that since petitioner's release from prison, he has become committed to his family, community, and has become a mentor to new union members.

Lastly, Peters testified about his life prior to the incident and his life after incarceration. He testified that before the incident, the union was the most important thing in his life. He also recognizes that he used to drink heavily. While working as Deputy Trustee (after the incident but before he was incarcerated), he learned that he could use non-violent measures while still advocating for union rights. He supervised approximately twenty-five people in that capacity and contends he learned a lot from that experience.

Peters testified that the arson was uncharacteristic of him. Now, as a forty-two year old man, he realizes the severity of his mistake. He acknowledged that the arson was dangerous and testified that he wants to right the embarrassment and disappointment he brought upon his family. He testified that since his release, he barely drinks, and his family is the most important thing in his life. He also submits that he recently became involved with Big Brothers Big Sisters, the West Islip Breast Cancer Coalition, and the United War Veterans Council. He testified that he has made changes in his family and personal life and is truly remorseful and takes responsibility for his actions.

These changes, in the aggregate, show rehabilitation. It has been almost ten years since the arson, and Peters realizes

how serious his crime was. He admitted that ten years ago, the union was the most important thing in his life, but now recognizes that it should not be; he is more focused on family and his integrity. Through his petition, the hearing, and testimony from family and friends, Peters has adequately shown that he is rehabilitated.

### C. *Nexus Between Crime Committed and Position Sought*

Peters and Masino both testified that there are several job opportunities waiting for him if his requested reduction is granted. According to the petition, there are three potential positions for him, including business agent, field representative, and construction market representative. The nature of the potential positions is helpful to determine whether Peters can be trusted in the position should the disability be reduced. *See Martin*, 2009 WL 928631, at *3 (denying petitioner's request where he did not specify the type of position he sought, making it difficult for the court to decide if he could be trusted in that position). Further, it is important to determine the relationship between the crime Peters committed and the positions he would like to hold.

The evidence demonstrates Peters would have a job immediately upon reduction of the disability. The letters of support from potential employers Mr. Sabitoni and Mr. Loscalzo enthusiastically express a desire for Peters to work with LIUNA or the local unions again. Those who have worked with Peters acknowledge his aptitude for the job and state that he would be a valuable asset to the union.

There is no direct nexus between the crime Peters committed and the type of work he would be doing if a reduction is granted. Although arson is an enumerated crime under the statute, and is a serious felony, it is not the type of crime that necessarily questions whether he will take advantage of a position of authority. *Martin*, 2009 WL 928631, at *4 ("[S]ome crimes such as murder and assault are wholly unrelated to union employment, [whereas] felonies involving abuse or misuse of one's position in a labor organization to obtain illegal gain at the expense of union members, are directly related to employment as a union official."); *see also Henry*, 2007 WL 1040856, at *5 ("[Petitioner's] offense is not in the same league as offenses typically associated with union impropriety (extortion, bribery, etc.).").

For example, in *Cullison*, the petitioner motioned for relief from disability after being convicted under the Racketeer Influenced and Corrupt Organizations Act. 422 F.Supp.2d at 66. The district court denied his request because the nature and extent of his crimes were directly related to the position of authority he wished to secure. *Id.* at 72 (explaining that petitioner extorted unmarked and unsealed ballots from union members, using them to vote in favor of his co-defendants, and replaced already-sealed ballots with ballots in their favor).

While arson is a very serious crime, it is not one that demonstrates petitioner's propensity to abuse a position of authority. Peters testified that none of the positions available to him involve much physical labor and rather, would utilize his enthusiasm for the union and allow him to be gainfully employed despite his physical work-related injuries. He recognizes that all labor union positions require a great deal of responsibility.

### IV. *CONCLUSION*

In conclusion, Peters has demonstrated that he has been rehabilitated since his commission of the arson ten years ago. He has made significant changes in his personal life, and the arson does not indicate that he is incapable of now being

trusted with responsibility in a position of authority. Under these circumstances, a statutory disability of thirteen years is too harsh for Peters. Petitioner has met his burden to show that he can be "trusted not to endanger the organization in the position for which he ... seeks relief from disability." *See* U.S. Sentencing Guidelines Manual § 5J1.1. He is entitled to a reduction to a period of four years from the date of his release from prison.

Therefore, it is

ORDERED that

1. Defendant petitioner John Peters's motion to reduce his statutory disability pursuant to 29 U.S.C. § 504(a) is GRANTED;

2. The statutory disability pursuant to 29 U.S.C. § 504(a) is reduced from thirteen years to four years; and

3. On May 13, 2013, defendant petitioner John Peters is released from the prohibitions of 29 U.S.C. § 504(a).

IT IS SO ORDERED.